# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

Nos. 97-1936 /1978
_____

Robert A. Walls,                               *
                                               *
      Appellee/Cross-Appellant,    *
                                               *
   v.                                       *   Appeal from the United States District
                                               *   Court for the Eastern District of Missouri.
Michael Bowersox,                              *
                                               *
      Appellant/Cross-Appellee.    *
                                               *

_____

Submitted: May 13, 1998
Filed: August 6, 1998
_____

Before BEAM, LOKEN, and MURPHY, Circuit Judges.
_____

BEAM, Circuit Judge.

     Michael Bowersox appeals the district court's grant of a writ of habeas corpus to Robert Walls. The district court found that trial counsel was constitutionally ineffective during the sentencing phase of Walls's capital murder trial and vacated his death sentence. Walls cross-appeals the district court's adverse holdings on a multitude of other issues. We hold that Walls's counsel was not constitutionally deficient, find the cross-appeal to be without merit, and reverse.

## I.     BACKGROUND

Fred C. Harmon, an eighty-eight-year-old widower lived alone in Maplewood, Missouri.  On December 18, 1985, friends became concerned when they had not seen Harmon for several days, and summoned police to conduct a welfare check at Harmon's home.  When the police entered the house, they discovered pools of blood on the kitchen floor, the bedroom floor, and the bed, and blood splattered on the bedroom wall.  Four stove burners were on, with the pilot lights extinguished.  The police noticed that a deep freeze, which opened from the top, had an arm chair, television, and a large typewriter stacked on it and that food was piled behind it.  They opened the freezer and found Harmon's body.

An autopsy revealed that Harmon had been viciously beaten: he had sustained numerous blunt trauma injuries to his head and limbs, an injury which separated his scalp from the skull in the middle of his head, broken ribs on his left side, and a bruised spleen.  Harmon had also suffered facial injuries consistent with being kicked. Death was attributed to a combination of blunt injuries, hypothermia, and suffocation. Medical evidence showed that Harmon could have remained alive in the freezer for over an hour before succumbing to either suffocation or hypothermia.

Two days after Harmon's body was discovered, police found Harmon's car in Santa Monica, California.  Walls, who was twenty years old at the time, was already in custody for burglary.  Under questioning by the police, Walls confessed that he and two others had committed the murder.

On the Friday before the murder, Walls had been transferred from the Jefferson City, Missouri, penitentiary to a halfway house in St. Louis pending release on parole. Two days later, Walls and two other prisoners escaped from the facility and went out drinking.  One of the fugitives stated that he knew an old man from whom he could get a car and some money with which the three could flee the St. Louis area.

The trio went to Harmon's home where Walls kept a look-out while the other two broke into the house. When Walls later entered, blood was everywhere and Harmon was crying on the bedroom floor. The three tried to bind Harmon with neckties, but he resisted and was beaten again. Walls first stepped on Harmon's face and then held his feet while the others tied him up. All three dragged Harmon, who was still conscious and fighting, into the kitchen. The trio decided to put Harmon in the freezer and then to blow up the house. Walls helped to clean out the freezer to make room for Harmon, then helped the others lift the still-struggling Harmon and stuff him inside the freezer, head first. When Walls later opened the freezer, Harmon begged, "I'm already dead, let me die, . . . let me die." After sharing soda out of the refrigerator with his partners, Walls went back in the bedroom for the keys to the car. When he returned to the kitchen, the television and a typewriter had been placed on top of the freezer. Walls lifted the typewriter, and called out, "Are you in there?" When he heard Harmon moaning, Walls replaced the typewriter. A chair was added to the top of the freezer. The three then turned on the gas and left in Harmon's car.

Walls was charged with capital murder and counsel was appointed for him. Originally counsel planned on having another lawyer handle the penalty phase, if one occurred, but the penalty-phase lawyer ultimately withdrew from the case. In preparation for the penalty phase of the trial, counsel retained a social worker to investigate Walls's family background and another lawyer to serve as second chair at trial and assist with witness preparation.

At defense counsel's request, a psychiatrist examined Walls prior to trial. The psychiatrist concluded that Walls did not suffer from any mental disease or defect sufficient to constitute a defense, and that no further testing was warranted. Defense counsel obtained a second exam that, likewise, revealed no mental disease or defect and recommended no additional testing. Both reports noted that Walls was alcohol-dependant, but concluded that he was able to conform his actions to the requirements of the law.

The jury found Walls guilty of murder in the first degree, robbery in the first degree, and burglary in the first degree. They imposed the death penalty.[1] The verdict and sentence were affirmed on direct appeal. See Missouri v. Walls, 744 S.W.2d 791 (Mo.), cert. denied, 488 U.S. 871 (1988).

Walls moved to vacate the judgment and sentence pursuant to Rule 29.15 of the Missouri Supreme Court Rules of Criminal Procedure. Among other things, he alleged that trial counsel had been ineffective in failing to present the testimony of certain family members during the penalty phase, in neglecting to seek additional psychiatric testing, and in electing not to present the testimony of the doctor who had conducted the second evaluation. The state court conducted a two-day hearing at which Walls's mother, father, sister, brother, and step-brother testified. They reported that when Walls was around seven years old, his parents divorced and each married one spouse of another married couple: in other words, they swapped partners. They testified that this unusual arrangement was upsetting and stressful for the children of both families. Walls's siblings also described the physical and emotional abuse they endured as children. Both Walls's mother and father testified that they had been contacted by the defense team but had refused either to attend trial or to testify on Walls's behalf. A psychologist also testified at the Rule 29.15 hearing. He opined that Walls's alcohol abuse and a previous attempt at suicide by hanging could have caused brain damage and that it was "conceivable" that neuropsychological testing would have revealed some organic brain dysfunction. The doctor who had conducted the second psychiatric

---

[1]As aggravating circumstances, the jury found that (1) the murder was committed for the purpose of receiving money or any other thing of monetary value from the victim, see Mo. Rev. Stat. § 565.032.2(4); (2) the murder involved torture or depravity of mind, see Mo. Rev. Stat. § 565.032.2(7); (3) Walls committed the murder after he escaped from the lawful custody of a place of lawful confinement, see Mo. Rev. Stat. § 565.032.2(9); (4) the murder was committed while Walls was engaged in the perpetration of burglary in the first degree and/or robbery in the first degree, see Mo. Rev. Stat. § 565.032.2(11); and (5) Walls had three prior convictions for burglary in the second degree. See Mo. Rev. Stat. § 565.032.1(3) (Supp. 1984).

exam of Walls also testified. He reported that he was aware of Walls's alcohol abuse at the time of the exam, but had not recommended additional testing. Finally, the lawyers who had conducted Walls's defense testified. Each reviewed and explained the developments of the investigation and trial strategy. The state court concluded that counsel was not ineffective and denied relief. See Walls v. Missouri, 779 S.W.2d 560 (Mo. 1989), cert. denied, 494 U.S. 1060 (1990).

Walls next filed a petition for a state writ of habeas corpus pursuant to Missouri Supreme Court Rule of Criminal Procedure 91, which the state circuit court immediately transferred to the Missouri Supreme Court. The state supreme court summarily denied the petition and Walls's subsequent motions to recall the mandate and for a rehearing.

After five years of litigation in state court, Walls filed a petition for a writ of habeas corpus in federal district court, alleging eighty-eight grounds for relief. The district court denied Walls's request for an evidentiary hearing,[2] but granted the writ on the basis of ineffective assistance of counsel. The court found that trial counsel was constitutionally defective in failing to present the testimony of Walls's family, in failing to request further psychiatric testing, and in failing to call the second psychiatrist as a mitigation witness. Counsel was additionally ineffective, the court held, in failing to request a continuance in order to conduct further investigation. The district court

---

[2]Although the district court denied Walls's motion for an evidentiary hearing, it relied upon six affidavits submitted by Walls that were not presented at the 29.15 hearing. A habeas petitioner is entitled to expand the state court record only if he can show cause for his failure to develop the facts in state court and prejudice from that failure. See Keeney v. Tamayo-Reyes, 504 U.S. 1, 11-12 (1992). Walls has offered no explanation for his failure to present this evidence at his 29.15 hearing. Four of the six affidavits are from witnesses who testified at the hearing, and merely add information to that testimony which could easily have been elicited during the hearing. Even if Walls had shown cause for his failure to present this evidence in state court, we have carefully reviewed the affidavits and find that Walls has not shown prejudice.

denied relief on all other grounds.  Bowersox appeals the district court's finding of ineffective assistance of counsel.  Walls cross-appeals on multiple other claims.

## II.   DISCUSSION

We review the district court's findings of fact for clear error and its conclusions of law de novo.  See McDonald v. Bowersox, 101 F.3d 588, 592 (8th Cir. 1996), cert. denied, 117 S. Ct. 2527 (1997).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 68 (1991).  Pursuant to 28 U.S.C. § 2254 (1994), we presume state court findings of fact to be correct in habeas proceedings "unless conditions exist which cast those findings into doubt."  Guinan v. Armontrout, 909 F.2d 1224, 1228 (8th Cir. 1990).[3]

### A.   Ineffective Assistance of Counsel

Claims of ineffective assistance of counsel are governed by the two-part test of Strickland v. Washington, 466 U.S. 668 (1984).  We have previously labeled these two prongs the "performance test" and the "prejudice test."  Kenley v. Armontrout, 937 F.2d 1298, 1303 (8th Cir. 1991).  In order to pass the performance test, Walls must establish that his lawyer "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Strickland, 466 U.S. at 687.  Our scrutiny of counsel's performance is deferential, and we presume counsel's conduct to be "within the range of competence demanded of attorneys under like circumstances."  Starr v. Lockhart, 23 F.3d 1280, 1284 (8th Cir. 1994).   Under the

---

[3]Certain provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996), amended the federal statutory law of habeas petitions.  Since Walls's petition for habeas relief was pending in the district court prior to April 24, 1996, however, these new provisions do not apply to his claim. See Lindh v. Murphy, 117 S. Ct. 2059, 2063 (1997).

prejudice test, Walls must prove "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Strickland, 466 U.S. at 694.  When a petitioner is challenging a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Id. at 695.  Our focus must be on whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair."   Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). With these considerations in mind, we turn to Walls's allegations.

The district court concluded that counsel's failure to secure testimony from the Walls family was the result of incompetence.  Walls was prejudiced by that failure, according to the district court, because the jury did not learn of his difficult family life or hear a plea on his behalf.  The district court discounted the Missouri state courts' prior findings of effective representation by reasoning that they had not considered the inadequacy of counsel's pre-trial investigation.

The duty to investigate derives from an attorney's basic function, which is "to make the adversarial testing process work in the particular case."  Strickland, 466 U.S. at 690.  "Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, . . . counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Kimmelman v. Morrison, 477 U.S. 365, 384 (1986) (quotation omitted).

Here, the defense team made an extensive effort to investigate Walls's family background and to secure the family's testimony at trial.  Walls identified sixteen potential witnesses for the penalty phase.  The social worker who had been retained by

defense counsel attempted to contact each witness.[4]  At the 29.15 hearing, Walls's mother testified that the social worker telephoned her repeatedly and engaged her in "lengthy" conversations.  Additionally, the social worker had several discussions with Walls's father, stepmother, and numerous other relatives.  The second-chair attorney also talked to Walls's mother, father, and stepmother several times.  Finally, lead counsel himself spoke with Walls's mother, father, stepmother, and sister prior to the penalty phase of the trial.  This is not a case in which counsel failed to conduct a reasonable inquiry into potential mitigation witnesses.  See, e.g., Kenley, 937 F.2d at 1306-07 (counsel ineffective when he failed to investigate defendant's troubled family life and mental instability, and rejected offers by family and social worker to assist in investigation); Thomas v. Lockhart, 738 F.2d 304, 308 (8th Cir. 1984) (counsel's investigation deficient where he did nothing beyond reading police file); Pickens v. Lockhart, 714 F.2d 1455, 1467 (8th Cir. 1983) (counsel ineffective where he failed to make any investigation whatsoever and "abdicated all responsibility for defending his client in the sentencing phase").

In all of their contacts with the defense team, the family steadfastly refused even to attend the trial, much less to testify.  Walls's mother declined to come because she "didn't want to get involved."  Walls's sister testified that she was "scared . . . because it was so highly publicized."  Walls's father explained that "I didn't want to get my name . . . drug into this."  Walls argues that counsel was ineffective in failing to change his relatives' minds.  Although counsel was unable to procure the testimony of the family members, we cannot say it was from lack of effort.

---

[4]Walls dismisses both the social worker's and second-chair's investigations by focusing exclusively on the personal efforts of lead counsel.  However, it is neither unprofessional nor unreasonable for a lawyer to use surrogates to investigate and interview potential witnesses rather than doing so personally.  See Harris v. Dugger, 874 F.2d 756, 762 & n. 8 (11th Cir. 1989).  In fact, we have criticized counsel in other cases for failing to utilize subordinates to conduct pre-trial investigation.  See Henderson v. Sargent, 926 F.2d 706, 714 (8th Cir. 1991).

Walls next asserts that counsel should have subpoenaed the family to testify if they would not attend voluntarily. The decision to call family members as witnesses is a "strategic decision." Malone v. Vasquez, 138 F.3d 711, 721 (8th Cir. 1998). Thus, Walls must "overcome a strong presumption that his counsel's actions constituted reasonable trial strategy." Snell v. Lockhart, 14 F.3d 1289, 1301 (8th Cir. 1994) (quotation omitted). "Decisions relating to witness selection are normally left to counsel's judgment, and this judgment will not be second-guessed by hindsight." Williams v. Armontrout, 912 F.2d 924, 934 (8th Cir. 1990) (en banc) (quotation omitted).

We find that counsel's decision not to compel Walls's family to testify was entirely reasonable. It makes little sense to force unwilling family to testify in mitigation. If counsel had done so, "cross-examination would not even have been necessary in order to hurt [Walls's] case. The simplest questions asked on direct examination would have revealed the relatives' total lack of support." Laws v. Armontrout, 863 F.2d 1377, 1391 (8th Cir. 1988) (en banc). Hostile and grudging testimony by Walls's family could well have been more damning evidence than anything presented by the prosecution.

Counsel's decisions thus fall within the range of reasonable representation, and Walls has therefore not established the first prong of the Strickland standard. However, even if counsel's performance had been deficient, Walls could not show prejudice. We find no "reasonable probability that, but for counsel's [allegedly] unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 695. "The value of this unoffered testimony must be substantial to prove prejudice." Stokes v. Armontrout, 851 F.2d 1085, 1095 (8th Cir. 1988). The family's testimony does not meet this threshold.

The unoffered testimony alleging physical and emotional abuse is not of substantial value. At the 29.15 hearing, both Walls's mother and father denied that

-9-

Walls was abused. Walls's brothers testified that they had never seen Walls either physically or emotionally abused. The siblings did report that they themselves were "backhanded," "knocked around," and "smack[ed]." Walls's sister described an incident when Walls was "beat[en]" for knocking over a plant. She also testified that Walls's mother sometimes struck the children with a belt and told them she did not love them and wished that they had never been born. While this testimony paints an unpleasant picture of Walls's childhood, it pales in comparison to evidence of abuse that has been held to be significantly mitigating. See Parkus v. Delo, 33 F.3d 933 (8th Cir. 1994) (defendant suffered brutal physical and sexual abuse). Furthermore, the value of this unoffered evidence must be balanced against the gruesomeness of Walls's crime and the five aggravating factors found by the jury. The absence of this testimony does not undermine our confidence in the outcome of Walls's trial.

Likewise, we find that the unoffered plea for mercy by Walls's family is not of substantial value. "It is not enough merely to speculate that a tearful parent on the stand might have evoked pity." Stokes, 851 F.2d at 1095. In Walls's case, the closest thing to a plea for mercy came when his mother was asked if she loved her son. Her telling response was, "Do I love my son? I love the son that I gave birth to that I knew. I do not know this person sitting there any more. But I loved him." The absence of this ambivalent plea for mercy from the penalty phase does not undermine our confidence in the outcome of Walls's trial.

The already limited value of Walls's family's testimony is further reduced when one considers the negative information that would also have been elicited from them. See Whitmore v Lockhart, 8 F.3d 614, 623 (8th Cir. 1993). The family's testimony at the 29.15 hearing included descriptions of Walls as a belligerent teenager with a violent temper and revealed that Walls had stolen from and fought with family members. "[I]t was surely not unreasonable for [counsel] to have concluded that cross-examination might well have revealed matters of historical fact that would have harmed his client's chances for a life sentence." Burger v. Kemp, 483 U.S. 776, 792 (1987).

Counsel's failure to request neuropsychological or other testing was similarly within the range of competent representation and did not render Walls's trial unreliable or unfair. It was entirely reasonable for counsel to rely on the conclusion of two trained psychiatrists that no additional testing was warranted. See Six v. Delo, 94 F.3d 469, 474 (8th Cir. 1996), cert. denied, 117 S. Ct. 2418 (1997). Counsel is not required to "continue looking for experts just because the one he has consulted gave an unfavorable opinion." Sidebottom v. Delo, 46 F.3d 744, 753 (8th Cir. 1995). Likewise, the Constitution does not require counsel to shop around for more elaborate tests that could be requested on the off chance that they will reveal some exotic disorder. Accordingly, we hold that counsel's failure to request neuropsychological evaluation or other additional testing does not constitute ineffective assistance of counsel.

Our resolution of the performance test on this issue makes it unnecessary for us to reach Strickland's prejudice inquiry. However, we note that Walls has not demonstrated any prejudice stemming from the lack of additional testing. He has made no showing that these tests would have revealed exculpatory or mitigating information. The strongest statement Walls can muster in support of prejudice is the psychologist's testimony that it is "conceivable" that Walls suffers from some organic brain dysfunction. This speculation does nothing to undermine our confidence in the outcome of Walls's trial.

The district court next found that counsel was incompetent for failing to present the testimony of the psychiatrist who conducted the second evaluation of Walls. In particular, the district court held that counsel should have told the doctor about Walls's unusual family background, his alcohol abuse, and his attempted suicide by hanging, because the doctor could have used this information to craft mitigating testimony on Walls's behalf. However, the doctor knew of this information and specifically referred to it in his report. Thus, there is simply no merit to this claim. Moreover, at the 29.15 hearing, counsel testified that "when it became obvious that none of the family members were going to show up, I was reluctant just to put on a psychiatrist to say that

[Walls] had an anti-social personality disorder or that he was just mean, without anything to show the background as to how he got to be that way." This strikes us as precisely the sort of reasoned strategic decision of counsel that is "virtually unchallengeable." Strickland, 466 U.S. at 690.

The district court also held that counsel was ineffective in failing to seek a continuance immediately prior to the commencement of the trial. It based this conclusion on its determination that counsel had failed to properly investigate potential mitigation evidence. Our holding that trial counsel's investigation was constitutionally adequate disposes of this claim as well. Walls has not identified any additional information that counsel could have discovered had a continuance been granted, and we find no evidence that the outcome of the trial would have been different had counsel made such a request. See Kilgore v. Bowersox, 124 F.3d 985, 994 (8th Cir. 1997), cert. denied, 118 S. Ct. 2353 (1998). A reviewing court must not succumb to the temptation to view counsel's defense through the distorting prism of hindsight. See Fretwell v. Norris, 133 F.3d 621, 623-24 (8th Cir. 1998), petition for cert. filed, No. 97-9345 (May 29, 1998). It is easy to conclude that a trial strategy was unreasonable after it has proved unsuccessful; however, trial tactics and strategies must be examined in light of counsel's perspective at the time they were devised. See id.

The district court found "[t]he most telling" evidence of ineffectiveness to be counsel's own affidavit which states that he believes he provided Walls with ineffective assistance of counsel. However, admissions of inadequate performance by trial lawyers are not decisive in ineffective assistance claims. See Harris v. Dugger, 874 F.2d 756, 761 n. 4 (11th Cir. 1989). Ineffectiveness is a question for the courts, not counsel, to decide. See id. Moreover, we view counsel's pronouncements regarding his performance with extreme skepticism, given his frank admission at the 29.15 hearing

-12-

that his trial strategy was driven, in part, with an eye to providing Walls a colorable claim of ineffective assistance of counsel on habeas review.[5]

In sum, we find that defense counsel's performance was "within the range of competence demanded of attorneys under like circumstances." Starr, 23 F.3d at 1284. Given the strength of the state's case, the limited value of the unoffered testimony, and the five separate aggravating circumstances found by the jury, we are convinced that even if counsel had performed exactly as Walls now claims he should have, the jury would not have imposed a lesser sentence. See Strickland, 466 U.S. at 694. There is no indication in the record that the state proceedings were fundamentally unfair or unreliable, and Walls is therefore not entitled to relief on his ineffective assistance of counsel claim. See Fretwell, 506 U.S. at 369.

### B. Prosecutor's Remarks

In his cross-appeal, Walls asserts that certain comments made by the prosecutor at trial violated the Fifth, Sixth, Eighth, and Fourteenth Amendments of the U.S. Constitution. The appropriate standard of review for this claim is "the narrow one of due process, and not the broad exercise of supervisory power that [we] would possess in regard to [a federal] trial court." Donnelly v. DeChristoforo, 416 U.S. 637, 642 (1974) (quotation omitted). In order to determine the effect of a prosecutor's remarks, we examine the totality of the circumstances. See Antwine v. Delo, 54 F.3d 1357, 1363 (8th Cir.1995) (listing factors), cert. denied, 516 U.S. 1067 (1996).

After careful review of the entire transcript, including the closing arguments of both phases of the trial, we are not convinced that the challenged statements were improper. The comments about which Walls complains, when read in context, do not

---

[5]We add that any type of "sandbagging" is "not only unethical, but usually bad strategy as well." United States v. Day, 969 F.2d 39, 46 n. 9 (3d Cir. 1992).

carry the meaning he ascribes to them. Even if any of the challenged comments were improper, however, they did not fundamentally taint the proceedings. Inappropriate remarks do not warrant federal habeas relief unless they infect the trial with enough unfairness to render a defendant's conviction a denial of due process. See Darden v. Wainwright, 477 U.S. 169, 181 (1986). "Improper prosecutorial remarks violate due process when there is a reasonable probability the remarks affected the trial's outcome." Roberts v. Bowersox, 137 F.3d 1062, 1066 (8th Cir. 1998). We are not convinced that, but for the challenged comments, the jury would have acquitted Walls or imposed a lesser sentence. We therefore affirm the district court's denial of habeas relief on these claims.

### C.     Exclusion of Venirepersons

Walls also claims that the district court erred in failing to grant relief on his claims regarding three venirepersons who were excluded from the panel after voir dire. The state argues that these claims are defaulted and that we therefore cannot consider them. We need not address whether Walls is procedurally barred from pursuing these claims because we find them to plainly be without constitutional merit. See Thompson v. Jones, 870 F.2d 432, 434 (8th Cir. 1988).

Venirepersons may be excluded from a jury based on their views about capital punishment when those views would prevent or substantially impair the performance of their duties as a juror. Adams v. Texas, 448 U.S. 38, 45 (1980). During voir dire, three venirepersons expressed deep misgivings about their ability to impose the death penalty. Venireperson Houser, when asked by the prosecutor, "[C]ould you consider the death penalty?" answered, "At this juncture, no." Likewise, venireperson Ferrick stated, "I believe that no man has the right to take another man's life." The prosecutor followed up by asking "Are you saying [that] you could not vote for the death penalty?" Ferrick answered, "Yes, sir." Finally, venireperson Meyer stated, "I sincerely doubt . . . that I would be able to impose the death penalty if it was needed. I don't think I

-14-

could do it." Defense counsel was offered an opportunity to question each potential juror to show that they could follow the law, but these three did not alter their positions. The trial court then excused them for cause.

A trial court may excuse potential jurors for cause if it finds that their "views would prevent or substantially impair the performance of [their] duties as [jurors] in accordance with [their] instructions and [their] oath." Wainwright v. Witt, 469 U.S. 412, 424 (1985). In reviewing this determination, we are mindful that "deference must be paid to the trial judge who sees and hears the juror." Id. at 426. When a state trial or appellate court has made a factual finding of a claim a petitioner raises on habeas corpus, we defer to that finding if it is fairly supported by the record. See Murray v. Delo, 34 F.3d 1367, 1377 (8th Cir. 1994). Here, the record amply supports the trial court's decision to remove these venirepersons, and the district court did not err in denying Walls federal habeas relief on this claim.

We have carefully considered each of Walls's remaining arguments and find them to be without merit. The district court therefore did not err in denying relief on those claims.

## III. CONCLUSION

The judgment of the district court is affirmed in part and reversed in part. The grant of the writ of habeas corpus is reversed and Walls's death sentence is reinstated.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-15-